| | |
|---|---|
| 1 | PILLSBURY WINTHROP LLP |
| | WILLIAM GAUS  #054999 |
| 2 | NATALIE A. BECCIA #180991 |
| | URSULA A. WYNHOVEN  #206901 |
| 3 | 50 Fremont Street |
| | Post Office Box 7880 |
| 4 | San Francisco, CA  94120-7880 |
| | Telephone:  (415) 983-1000 |
| 5 | Facsimile:  (415) 983-1200 |
| 6 | PATTON BOGGS LLP |
| | SALLY D. GARR |
| 7 | GREGORY S. WALDEN |
| | 2550 M Street, N.W. |
| 8 | Washington, DC  20037 |
| | Telephone:  (202) 457-6000 |
| 9 | Facsimile:  (202) 457-6315 |
| 10 | Attorneys for Plaintiff |
| | AEROGROUND, INC. |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AEROGROUND, INC., | ) | No. C 01-1628 VRW |
| Plaintiff, | ) | |
| | ) | REPLY BRIEF IN SUPPORT OF |
| vs. | ) | MOTION FOR PRELIMINARY |
| | ) | INJUNCTION |
| CITY AND COUNTY OF SAN | ) | |
| FRANCISCO; SAN FRANCISCO | ) | |
| AIRPORT COMMISSION; and JOHN L. | ) | |
| MARTIN, in his official capacity as Director | ) | |
| of the San Francisco International Airport, | ) | |
| Defendant. | ) | |

# TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT. ............................................. 1

II. ARGUMENT. ................................................................................................................ 2

    A. Aeroground's Showing of Probable Success on the Merits has Not Been Refuted. ................................................................................................................ 2

        1. The City's Attempt to Portray Itself as a "Market Participant" Ignores the Legal Standard and Misstates its Relationship to Aeroground. .................................................................................................. 2

            a. In enacting the Rule, the City was not procuring goods or services for its own use or benefit. .................................................................. 2

            b. The Rule is not limited to employers with whom the City has proprietary dealings, but applies broadly to all employers at the Airport. ....................................................................................................... 4

        2. The City Glosses Over, Rather than Disputes, the Contradictions of the National Labor Relations Act. ............................................................... 5

        3. Waiver Does Not Apply Here Because Plaintiff Did Not Voluntarily Sign the Permit. ................................................................................................ 5

    B. The City has Not Refuted Aeroground's Showing of Irreparable Injury or Shown the Balance of Hardships Favors Denial of the Injunction. ........................ 7

        1. The Rule Has Inflicted, is Inflicting, and Will Continue to Inflict Injury on Aeroground if Not Enjoined. ............................................................ 7

            a. The City's Practice with Respect to Aeroground and Others Has Been to Threaten Complete Devastation of Business Absent Immediate Compliance. ............................................................................. 7

            b. The City's supposed change of heart is equivocal, incomplete and unconvincing. ............................................................................................ 8

        2. Even if an Exemption Were to be Granted in the Future, Aeroground is Suffering Irreparable Injury in the Meantime. .......................................... 10

            a. Irreparable Injury is Caused By Damage to Goodwill, Particularly in a Fluid Market. ...................................................................................... 10

            b. The City is Inflicting Harm Through Lax Enforcement of its Rules. .......... 12

        3. The Alleged Hardship to the City is Illusory. ............................................... 14

            a. The "peace" supposedly provided by the Rule is provided only during the pendency of the organizing drive, when it is required by law in any event. ........................................................................................ 14

    b. Aeroground only asks the Court to require the City to do what it professes to be willing to do voluntarily. ....................................................... 15

III. CONCLUSION ................................................................................................. 15

TABLE OF AUTHORITIES

Page(s)

Cases

Alameda Newspapers, Inc. v. City of Oakland,
    95 F.3d 1406 (9th Cir. 1996)..................................................................................3

Associated Builders & Contractors of Rhode Island, Inc. v. City of
        Providence,
    108 F.Supp.2d 73 (D.R.I. 2000) ...............................................................................3

Associated Builders and Contractors, Inc. v. City of Seward,
    966 F.2d 492 (9th Cir. 1992)....................................................................................3

Associated General Contractors of America v. Metropolitan Water Dist. of
        Southern California,
    159 F.3d 1178 (9th Cir. 1998)..................................................................................2

Babler Bros., Inc. v. Roberts,
    995 F.2d 911 (9th Cir. 1993)....................................................................................2

Bldg. and Constr. Trades Counsel of the Metro. Dist. v. Associated
        Builders & Contractors of Mass./R.I.,
    507 U.S. 218 (1993) .............................................................................................2, 3

Cardinal Towing & Auto Repair v. City of Bedford, Texas,
    180 F.3d 686 (5th Cir. 1999)................................................................................2, 3

Chamber of Commerce v. Reich,
    74 F.3d 1322 (D.C. Cir. 1996).................................................................................4

Colfax v. Illinois State Toll Highway,
    79 F.3d 631 (7th Cir. 1996)......................................................................................3

Crouch v. Prior,
    905 F. Supp. 248 (D.V.I. 1995)..............................................................................11

Evans Products Co. v. Millmen's Union No. 550,
    159 Cal.App.3d 815 (1984)......................................................................................6

FTC v. Sage Seminars, Inc.,
    1995 WL 798938 (N.D.Cal. 1995)...........................................................................8

Fuentes v. Shevin,
    407 U.S. 67 (1972) ...................................................................................................6

Garner v. Teamsters Union,
    346 U.S. 485 (1953) .................................................................................................5

Gerling Global Reins. Corp. of America v. Quackenbush,
    2000 WL 777978 (E.D. Cal. 2000) ........................................................................11

Golden State Transit Corp. v. City of Los Angeles,
    475 U.S. 608 (1986) .................................................................................................3

H.E.R.E.U. v. Marriott Corp.,
    961 F.2d 1464 (9th Cir. 1992)......................................................................................6

In re Loretto Winery Ltd.,
    898 F.2d 715 (9th Cir. 1990)........................................................................................6

Lucasey Mfg. Corp. v. Anchor Pad Int'l, Inc.,
    698 F.Supp. 190 (N.D. Cal. 1988)..............................................................................11

Mont-Bell Co., Ltd. v. Mountain Hardware, Inc.,
    1997 WL 414179  (N.D. Cal. July 10, 1997)...............................................................6

Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,
    944 F.2d 597 (9th Cir. 1991).......................................................................................11

Ross-Simons of Warwick, Inc. v. Baccarat,
    102 F.3d 12 (1st Cir. 1996) ........................................................................................11

Sun Microsystems, Inc. v. Microsoft Corp.,
    87 F.Supp.2d 992 (N.D. Cal. 2000)............................................................................11

Tanimura v. Antle, Inc. v. Packed Fresh Produce, Inc.,
    222 F.3d 132 (3rd Cir. 2000).......................................................................................11

U-Haul Int'l Inc. v. Jatran, Inc.,
    522 F.Supp. 1238 (D. Ariz. 1981)..............................................................................11

Van-Go Transport v. New York City Bd. of Educ.,
    53 F.Supp.2d 278 (E.D.N.Y. 1999)..............................................................................4

Vick v. Patterson,
    158 Cal.App.2d 414 (1958).........................................................................................6

Wisconsin Dep't of Indus., Labor and Human Relations v. Gould, Inc.
    475 U.S. 282 (1986) ....................................................................................................4

Statutes

29 U.S.C. § 158 (b)(4)..........................................................................................................15

29 U.S.C. § 158(b)(7)...........................................................................................................14

29 U.S.C. § 160(a).................................................................................................................5

I.     INTRODUCTION AND SUMMARY OF ARGUMENT.

The issues before the Court are whether Aeroground has shown a likelihood of success on the merits, combined with a threat of irreparable injury. Aeroground has shown that the challenged Rule is preempted by federal law and that its enforcement against Aeroground would end Aeroground's twelve year business at the San Francisco International Airport.

The City argues that there is little likelihood of Aeroground succeeding on the merits because the City is a "market participant" and thus within the Boston Harbor exception. In making this claim, the City carefully avoids articulating the legal test for determining such status because, measured against the correct legal standard, the City is clearly not a "market participant." The City further claims that none of the provisions of the Card Check Rule contradict the National Labor Relations Act ("NLRA") or the Railway Labor Act ("RLA"), but it glosses over, rather than addresses, Aeroground's showing to the contrary.

The City further argues that it would be substantially harmed without the Rule because the Rule forbids strikes and picketing, but the City misrepresents what the Rule actually says and overlooks the fact such conduct is already forbidden by existing law.

As to the injury to Aeroground, the City argues that the once-threatened harm has vanished because of, what it describes as, the likelihood that Aeroground will eventually obtain an RLA exemption. The City asserts that Aeroground is suffering no injury in the interim. However, the City's "likelihood" of granting an exemption is, in actuality, a "commitment" to change that is grudging, equivocal and, on its face, incomplete. Moreover, the alleged cessation of overt enforcement has not halted the irreparable injury to Aeroground.

II.  ARGUMENT.

    A.  <u>Aeroground's Showing of Probable Success on the Merits has Not Been Refuted</u>.

        1.  <u>The City's Attempt to Portray Itself as a "Market Participant" Ignores the Legal Standard and Misstates its Relationship to Aeroground.</u>

The City argues that it is not acting in a governing capacity but only as a "market participant" under <u>Bldg. and Constr. Trades Counsel of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I.</u>, 507 U.S. 218 (1993) ("<u>Boston Harbor</u>") because it derives revenues from operations such as Airport concessions, and expresses a desire to maximize those revenues. Under no circumstances is this the test of whether the City is acting as a "market participant," and particularly not with respect to Aeroground.

To determine whether the City was acting as a "market participant," in this case, two questions must be answered: First, does the Rule reflect the City's own interest in efficient procurement of needed goods and services as measured by comparison with the typical behavior of private parties in similar circumstances? Second, is the City's action narrowly focused in order to defeat an inference that its primary goal was to encourage a general labor policy, rather than address a specific proprietary problem. <u>Cardinal Towing & Auto Repair v. City of Bedford, Texas</u>, 180 F.3d 686 (5th Cir. 1999). The answer to both these questions demonstrates that the City's Rule is not the act of a market participant.

        a.  <u>In enacting the Rule, the City was not procuring goods or services for its own use or benefit</u>.

In all of the cases relied on by the City, including <u>Boston Harbor</u>, the government entity was *directly* contracting with the plaintiff for goods or services.[1] In this case, the

---

[1]   <u>Boston Harbor</u>, 507 U.S. 218 (1993) (City agency imposed requirements on successful bidder for harbor cleanup project); <u>Cardinal Towing & Auto Repair</u>, 180 F.3d at 689 (City imposed requirements on single company that contracted to perform tows requested by City police); <u>Associated General Contractors of America v. Metropolitan Water Dist. of Southern California</u>, 159 F.3d 1178 (9th Cir. 1998) (water district imposed requirements on successful bidder for contract to build reservoir); <u>Babler Bros., Inc. v. Roberts</u>, 995 F.2d 911 (9th Cir. 1993) (City imposed requirements for companies contracting to performing work on state and local government construction projects);
(continued…)

1  City has not contracted with Aeroground to purchase its cargo handling services.  In

2  addition, the City does not derive any revenue from Aeroground, other than the fee that is

3  paid to obtain an operating permit.[2]  Rather, the City is engaged in a licensing scheme that

4  controls the conditions under which Aeroground can contract for services with private third

5  parties; namely, the airlines.[3]  As the Courts have recognized, such "[l]icensing schemes do

6  not invite proprietary analysis."  Cardinal Towing, 180 F.3d at 693.

7        Although the City attempts to differentiate Golden State Transit Corp. v. City of Los

8  Angeles, 475 U.S. 608 (1986), that case is on point.  Both the defendant in Golden State

9  and here did not contract directly for services with the employers it was attempting to

10  regulate.  Rather, both were engaged in regulating the employers' conduct with respect to

11  third parties through the issuance of permits or licenses.  As the Court recognized in Boston

12  Harbor, the market participant exemption might have applied in Golden State if the City

13  directly "purchased taxi services from Golden State in order to transport city employees."

14  Boston Harbor, 507 U.S. at 227.  However, that was not the case and the doctrine was

15  therefore inapplicable -- just as it is here.

16        The City attempts to blur the relationship with Aeroground by describing it as a

17  contract, stating "plaintiff provides a service – cargo handling – that is essential to the

---

18  (…continued)
Alameda Newspapers, Inc. v. City of Oakland, 95 F.3d 1406 (9th Cir. 1996) (City declined
19  to continue purchase of newspapers from plaintiff); Associated Builders and Contractors,
Inc. v. City of Seward, 966 F.2d 492 (9th Cir. 1992) (City imposed requirements on
20  successful bidder for contract to complete transmission line renovation project); Colfax v.
Illinois State Toll Highway, 79 F.3d 631 (7th Cir. 1996) (City imposed requirements on
21  successful bidder for contract to remove asbestos from government-owned buildings).

22  [2]  Although the City points to revenues it derives from the airlines to whom
Aeroground provides services, Aeroground has no direct control over those revenues.
23  Moreover, such an indirect connection between Aeroground and the City cannot support a
claim of proprietary interest.  Cf. Associated Builders & Contractors of Rhode Island, Inc.
24  v. City of Providence, 108 F.Supp.2d 73 (D.R.I. 2000) (grant of favorable tax treatment to
builder was not sufficient participation in marketplace to shield City policy of requiring
25  execution of project labor agreements from preemption).

26  [3]  Although the City argues that the Permit does not apply to Aeroground's airline
customers who have cargo handling facilities off-site, this is incorrect.  For example, cargo
27  for all of Aeroground's customers must be delivered onto Airport property in order to be
loaded onto the respective airplanes of the carriers.  See fn. 5, infra.

28

1 operation of the Airport." Def.'s Opp., pp. 19-20. This misleading statement obscures the
2 truth: Aeroground's only dealing with the Airport is its need for an permit. It has no other
3 "contract" with the Airport.

4     b. <u>The Rule is not limited to employers with whom the City has
5 proprietary dealings, but applies broadly to all employers at the
6 Airport</u>.

7 The cases relied on by the City are also distinguishable because they each involved
8 contract provisions in agreements with a single party with whom the governmental entity
9 was doing business. <u>See</u>  Sect. II (B)(2)(a), <u>supra</u>. By contrast, the Rule at issue in this
10 case broadly applies to all employers who want access to the Airport, past, present and
11 future. As recognized by the court in <u>Chamber of Commerce v. Reich</u>, 74 F.3d 1322, 1337
12 (D.C. Cir. 1996), a government entity will be hard pressed to show it is acting as a market
13 participant when it seeks to enforce a broad policy that applies to many individuals. <u>See</u>
14 <u>also</u> <u>Wisconsin Dep't of Indus., Labor and Human Relations v. Gould, Inc.</u> 475 U.S. 282,
15 286 (1986) (state labor policy had broad regulatory effect and was therefore preempted
16 even though state was acting as market participant).

17 For example, in <u>Van-Go Transport v. New York City Bd. of Educ.</u>, 53 F.Supp.2d
18 278, 281 (E.D.N.Y. 1999), the court examined a school board's policy of refusing to
19 conditionally certify more than a certain percentage of strike replacement workers for its
20 contractors. In rejecting the board's argument that the policy was not preempted by the
21 NLRA because the board was acting as a "market participant" under <u>Boston Harbor</u>, the
22 Court stated:

> the situation in this case is different from <u>Boston Harbor</u> in that this case involves not a single contract, but a regulatory policy that the [Board] incorporated into every contract it negotiated with its OPT contractors. Thus, unlike the situation in <u>Boston Harbor</u>, the policy at issue extended beyond the parties to a single contract, a critical distinction that [the Board] ignores.

27 53 F.Supp.2d at 288. The Court thus concluded that the Board's policy was preempted
28 because it severely curtailed, on an industry-wide basis, the ability of its contractors to hire

1  strike replacement workers -- a well-established and unquestioned federal right.  Id.  The
2  same result is dictated in this case.  The City has enacted a labor policy that broadly applies
3  to all employers at the Airport, even those from whom it obtains no goods or services.
4  Consequently, the Rule cannot escape preemption under the market participant exception.

     2.     <u>The City Glosses Over, Rather than Disputes, the Contradictions of the National Labor Relations Act</u>.

The City glosses over the contradictions between the Rule and the NLRA.  As we have shown, no case outside of the construction industry allows anyone, public or private, to dictate the labor relations rules or contracts of another company.  The City simply insists, without any supporting authorities, that it has the right to compel employers to waive their right to go to the National Labor Relations Board ("NLRB" or the "Board").

Aeroground has shown that the NLRA does not allow anyone to remove from the NLRB issues that are given to the Board by statute.  <u>See</u> Mot. for Prelim. Inj., pp. 11-12.  The City's Rule does precisely that, requiring private arbitration and foreclosing recourse to the NLRB.  The City presents no case which contradicts Aeroground's authority.  Instead, it simply implies that, since arbitration agreements are consistent with the NLRA, arbitration agreements which foreclose NLRB involvement must also be lawful.  They are not.  <u>See</u> 29 U.S.C. § 160(a); <u>Garner v. Teamsters Union</u>, 346 U.S. 485, 490-91 (1953).

Aeroground showed that requiring disclosure of employee names, home addresses and telephone numbers is unlawful.  <u>See</u> Mot. for Prelim. Inj., p. 13.  The City glosses over Aeroground's showing and refers only to cases allowing an employer to furnish "a list of employee names."

     3.     <u>Waiver Does Not Apply Here Because Plaintiff Did Not Voluntarily Sign the Permit</u>.

Defendants contend that plaintiff waived its right to challenge the Card Check Rule by signing the Permit which specifically requires compliance with the Rule.  It is well established, however, that a waiver is not effective unless it is made "voluntarily,

1 intelligently and knowingly." <u>Fuentes v. Shevin</u>, 407 U.S. 67, 94-95 (1972); <u>Mont-Bell
2 Co., Ltd. v. Mountain Hardware, Inc.</u>, 1997 WL 414179, *9 (N.D. Cal. July 10, 1997).

3     As set forth in the Declaration of Aeroground's Chief Executive Officer,
4 Aeroground did not voluntarily sign the Permit.  Declaration of Anthony Bonino ("Bonino
5 Decl."), ¶¶ 2-5.  Rather, Aeroground was presented with the new Permit and told to sign
6 and return it within fifteen days.  <u>Id.</u> at ¶ 4.  Aeroground specifically protested to the
7 Airport that it did not wish to sign the Permit because of the Card Check Rule requirement.
8 <u>Id.</u> at ¶ 5.  However, the Airport's agent made clear that Aeroground would not be
9 permitted to continue operating at the Airport unless and until it agreed to abide by the Card
10 Check Rule.  <u>Id.</u>  Having built up a substantial business at the Airport over the preceding
11 12 years including the employment of some 400 workers, Aeroground's only choice was to
12 sign the Permit if it wanted to stay in business at the Airport.  <u>Id.</u> at ¶¶ 2, 5.  Defendants
13 should not be permitted to rely on their coercion of Aeroground to support their claim of
14 waiver.[4]

15     Moreover, the waiver argument cannot apply with respect to Aeroground's claim
16 that the Card Check Rule compels conduct prohibited by the NLRA.  See <u>In re Loretto
17 Winery Ltd.</u>, 898 F.2d 715, 723 (9th Cir. 1990) (in California contracts for transactions that
18 violate the law are illegal and void);  <u>Evans Products Co. v. Millmen's Union No. 550</u>, 159
19 Cal.App.3d 815, 819 (1984) (courts will not enforce contracts requiring performance of
20 illegal act); <u>Vick v. Patterson</u>, 158 Cal.App.2d 414, 417 (1958) (courts will not enforce
21 contract to perform acts prohibited by statute).

---

[4]  In <u>H.E.R.E.U. v. Marriott Corp.</u>, 961 F.2d 1464, 1470 (9th Cir. 1992), cited by defendants in their opposition, the Court acknowledged, without deciding, that the employer's agreement to a card check procedure might not be enforceable if the agreement was the product of government intervention and duress.

      B.    <u>The City has Not Refuted Aeroground's Showing of Irreparable Injury or Shown the Balance of Hardships Favors Denial of the Injunction</u>.

          1.    <u>The Rule Has Inflicted, is Inflicting, and Will Continue to Inflict Injury on Aeroground if Not Enjoined.</u>

                a.    <u>The City's Practice with Respect to Aeroground and Others Has Been to Threaten Complete Devastation of Business Absent Immediate Compliance.</u>

The City's position with respect to the Rule has been that, unless a permittee complies with the Rule, it loses its permit and, thus, all its business at the Airport. The City's administration of the rule has been aggressive. The last official act of the San Francisco Airport Commission with respect to Aeroground was to deny both Aeroground's application for exemption and its request that a decision be deferred while the matter could be decided by the NLRB and the National Mediation Board ("NMB"). As the City acknowledges, the Commission's decision was based on the fact that "plaintiff had agreed by contract to enter into a Card Check Agreement." Def. Opp., p. 3. The Airport Director then gave Aeroground an immediate deadline to comply. See Declaration of Phil Scherer ("Scherer Decl.") ¶ 8, Exh. B. With respect to Hallmark Aviation Services ("Hallmark"), a potential intervenor in this case and the plaintiff in the related case of <u>Hallmark Aviation Services v. OPIEU</u>, the Court's records show that their petition for exemption from the Rule was denied and they, like Aeroground, were also given an immediate deadline to comply. The Commission allowed no realistic opportunity for these employers to qualify for the exemption. Instead, the City's operating procedure, followed up to the date this lawsuit was filed, is to treat the potential RLA exemption as irrelevant and demand compliance with economic devastation as the alternative. This is clearly irreparable injury.[5]

---

[5] The City, incredibly, argues that the loss of Aeroground's permit would not actually cause irreparable injury because "only" about half of Aeroground's operations are on Airport property. Pl. Opp. p.21. The City is implying that the other operations of Aeroground would be unaffected by the withdrawal of a permit. Aside from the City's cavalier attitude about the harm that it is inflicting, the statement is untrue. Every Aeroground operation, whether on or off Airport property, must regularly enter Airport

(continued…)

1          b.    <u>The City's supposed change of heart is equivocal, incomplete and unconvincing</u>.

The City implies that the pendency of proceedings before the NMB have caused such a complete change of heart on its part that an eventual exemption from the Card Check Rule for Aeroground should be regarded as a foregone conclusion. There are powerful reasons why the Court should not be swayed by these implied representations.

- The City followed an aggressive comply-or-die approach with respect to Aeroground literally up to the moment the Court first took the bench in this case on April 27, 2001, threatening the loss of Aeroground's permit as early as April 30, 2001. With respect to Hallmark, the City's enforcement against that employer's claim of a possible exemption is as aggressive as ever. <u>See</u> Declaration of Scott McGuffin in Support of Hallmark's Motion for Intervention ("McGuffin Decl."). This fact should be evaluated by the Court in assessing any assertion that the City's permit-threatening approach belongs to a different era. <u>See</u> <u>e.g.</u> <u>FTC v. Sage Seminars, Inc.</u>, 1995 WL 798938, *6 (N.D.Cal. 1995) ("courts should be wary of a defendant's termination of illegal conduct when … such action is taken in anticipation of formal intervention;" cession was not voluntary where conduct ceased only when Government authority commenced an investigation into the conduct).

- The City's intimation that an exemption for Aeroground is all but assured if the NMB deems Aeroground an RLA employer is contrary to the Airport

---

(…continued)
property to deliver and retrieve the cargo for loading onto the aircraft. Declaration of George Stark in Support of Reply ("Stark Decl.") ¶ 12. The employees delivering and retrieving cargo must have badges issued by the Airport in order to perform this function. <u>Id.</u> Every Aeroground cargo handling operation, regardless of location, would be out of business if the Airport withdrew its permit. <u>Id.</u> The Rule, on its face, applies to an "operating permit or similar agreement pursuant to which a contractor is to provide services . . . [that] are integral to the operation of the Airport." Declaration of Phillip C. Monrad in Support of Opposition ("Monrad Decl."), Exh. B, ¶ I.2. The City explicitly avers that plaintiff provides a service that is "essential to the operation of the Airport." Pl. Opp., pp. 19-20.

1    Commission's last ruling, which treated NMB proceedings as irrelevant, ruling
2    that Aeroground waived the exemption when it signed an agreement with the
3    Airport.  The Airport has not retreated from the validity of that position.  Indeed,
4    it is urging this position in its papers to this Court.  Pl. Opp., pp. 4-5.

5    • The exemption that the City is encouraging the Court to regard as all but assured
6      is not consistent with the language in the Rule.  The exemption in the Rule does
7      not apply to employers across the board, but applies only to "[a]n
8      Employer/Contractor's <u>operations</u> at the Airport which are subject to the
9      Railway Labor Act either by a final decision by a court or agency of competent
10     jurisdiction ..." Monrad Decl., ¶ 2, Ex A, ¶ II 4(e) (emphasis added).   Under this
11     language, the exemption, on its face, does not apply to all of Aeroground's
12     operations.  Only eight Aeroground operations are overtly before the NMB.[6]
13     <u>See</u> Beccia Decl. ¶ 2, Exh. A.  The Commission could thus decide that any
14     NMB ruling with respect to the eight operations would not address the RLA
15     status of the remaining Aeroground operations and, based on Aeroground's non-
16     compliance with respect to those operations, it would be subject to the City's
17     normal practice followed in the pre-litigation phase with Aeroground and
18     followed with respect to Hallmark to this day. The Rule's case-by-case approach
19     to separate operations would be completely contrary to the RLA and thus should
20     not be applied, despite what it says.  Thus, the Commission would be clearly
21     wrong if it followed this approach, but it would be consistent with the Rule.

---

[6]  The NMB has been given information on eight specific Aeroground operations: Air France; Asiana; Air China; Swiss Air; EVA; ANA; Singapore Airlines; and U.S. Airways. Declaration of Natalie A. Beccia in Support of Reply ("Beccia Decl.") ¶ 2, Exh. A. Aeroground has submitted information to the NLRB and the NMB with respect to each of these eight operations. <u>Id.</u>  The NMB has requested additional information with respect to six of these eight operations. <u>Id.</u> at ¶ 3, Exh. B.  Four operations of Aeroground, namely, Cargolux, Lufthansa, NCA and British Airways, were never placed at issue before the NLRB, and, as we have shown, the only way the NMB gets this issue is if a charge is filed with the NLRB <u>and</u> the NLRB, in its discretion, decides to refer it to the NMB.  Mot. for Prelim. Inj., p. 18.  One Aeroground operation, which began after the case arose, is not before the NMB and Aeroground is competing for others.  See Declaration of George Stark in Support of Motion for Preliminary Injunction ("Stark Decl.") ¶¶ 2 (Exh. A at ¶ 5), 9.

- The City's commitment as to the effect of an NMB decision, even with respect to the eight operations before the NMB, is equivocal and evasive. The City has not pledged that even these eight Aeroground operations will be exempt, only that the Airport Director will introduce a resolution to the Commission that the exemption be granted. Def.'s Opp., p. 4. The assurance is therefore illusory.

Thus, the City is asking the Court to regard a reversal of the Commission's action as a foregone conclusion based on the implications flowing from an equivocal and evasive "commitment" to introduce a resolution for exemption. The City would have the Court disregard prior conduct toward Aeroground, current conduct toward Hallmark, and the fact that the implied prospective action would be contrary to the Commission's past and current interpretation of the exemption. We submit that it would be more appropriate for the Court to conclude that the City has changed course only when it has actually done so.

2. <u>Even if an Exemption Were to be Granted in the Future, Aeroground is Suffering Irreparable Injury in the Meantime</u>.

   a. <u>Irreparable Injury is Caused By Damage to Goodwill, Particularly in a Fluid Market</u>.

Even if the City's non-enforcement policy and prospective exemption were unequivocal and certain to cover all of Aeroground operations, Aeroground is suffering irreparable injury in the interim. As the City has conceded, an airline that has difficulty working with Aeroground has many alternatives readily available. Declaration of Gary Franzella in Opposition to Motion for Preliminary Injunction ("Franzella Decl.") ¶¶ 4, 12-13. Aeroground competes with three other cargo handling companies for business at the Airport, each of whom would be ready and willing to move in on Aeroground's business. Stark Decl. ¶ 10. In a competitive environment such as this, monetary damages are extremely difficult to measure and inadequate.

Irreparable harm is present when money damages would be difficult to identify with certainty. See <u>Tanimura v. Antle, Inc. v. Packed Fresh Produce, Inc.</u> 222 F.3d 132, 141 (3rd

1  Cir. 2000) (irreparable harm exists when monetary damages are difficult to ascertain or are

2  inadequate).

3        A frequent example is where there is damage to reputation and goodwill.  Lucasey

4  Mfg. Corp. v. Anchor Pad Int'l, Inc., 698 F.Supp. 190, 192 (N.D. Cal. 1988) (wide

5  communication of allegations and customer concern about those allegations had significant

6  potential to affect plaintiff's established reputation and goodwill and therefore showed clear

7  possibility of irreparable injury).[7]  Irreparable injury is also present in a fluid market where

8  the damages cannot be measured because the effect of the conduct on any transaction is

9  difficult to determine.  U-Haul Int'l Inc. v. Jatran, Inc., 522 F.Supp. 1238, 1247 (D. Ariz.

10  1981) ("irreparable injury for the purpose of injunctive relief would be present for the very

11  reason that in an open market it is impossible to measure the exact amount of …

12  damages").

13        The Card Check Rule places Aeroground at a competitive disadvantage in its

14  dealings with customers and prospective customers.  While the Airport Commission

15  blithely assures the Court that 90% of cases referred by the NLRB to the NMB result in a

16  determination that the employer is covered by the RLA, [8] the fact is that the last official act

---

[7] Sun Microsystems, Inc. v. Microsoft Corp., 87 F.Supp.2d 992, 997-98 (N.D. Cal. 2000) (irreparable harm was demonstrated where money damages were inadequate because revenues and reputation were difficult to quantify); Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) (grant of preliminary injunction was held to be appropriate where damage to ongoing recruitment efforts and goodwill would be difficult to valuate); Ross-Simons of Warwick, Inc. v. Baccarat, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages.  Accordingly, this kind of harm is often held to be irreparable") (cited with approval in Gerling Global Reins. Corp. of America v. Quackenbush, 2000 WL 777978, *13 (E.D. Cal. 2000); Crouch v. Prior, 905 F. Supp. 248, 259-60 (D.V.I. 1995) ("The loss of a business's good will is sufficient to support a finding of irreparable injury.  The dollar value of good will generally is difficult to calculate").

[8] Even if that statistic were accurate, it says nothing about the probability that the NMB will determine Aeroground is covered by the RLA.  The NMB Investigator who is deciding the case has said that she evaluates each case as a new case. Declaration of Ursula A. Wynhoven in Support of Motion for Preliminary Injunction ("Wynhoven Decl.") ¶ 2. The Investigator has also said that, while there is an internal guideline that decisions on RLA coverage in cases referred by the NLRB be made within six months, that is merely a goal and there are no consequences for the NMB or the parties if the guideline is not met. Id.  The Investigator was unable to say when her decision will be made because she has not

(continued…)

---

10520696v3     - 11 -    REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 01-1628-VRW

1  of the Airport Commission was to deny Aeroground's exemption and to direct compliance

2  by April 30, 2001. Declaration of Matthew Ross in Support of Motion for Stay ("Ross

3  Decl.") ¶¶ 4, 5. Aeroground's customers and prospective customers are being repeatedly

4  advised that Aeroground is violating the Rule and is therefore jeopardizing their ability to

5  provide service at the Airport. For example, the flyer attached to the Declaration of Tryg

6  McCoy in Opposition to Motion for Preliminary Injunction ("Tryg Decl.") states:

> "Breaking Airport Rules puts customers at risk! As an airline passenger, you follow important safety regulations.… The Airlines must also abide by strict rules pertaining to the safety and security of the service they provide.… But you should ask, could Swiss Air be putting customers at risk by using Aeroground, a cargo handling company that doesn't follow Airport rules.…"

12  Attached to Aeroground's declarations are letters, flyers, accounts of personal visits to

13  every one of Aeroground's customers and prospective customers, and to the customers of

14  Aeroground's customers, all bearing the same message: "Aeroground . . . doesn't follow

15  Airport Rules . . . [Aeroground has] put at risk their ability to provide service at the Airport

16  at all." Wynhoven Decl., Exh. B; Stark Decl., Exhs. B-J; Bonino Decl., Exhs. A-I. At least

17  10 airlines have been contacted, to Aeroground's knowledge, and more than 5 customers

18  and prospective customers have cited these representations to question Aeroground's

19  reliability. Stark Decl. ¶ 6, 7, 11, Exh. A at ¶¶ 2-5; Bonino Decl. ¶¶ 6-8. Customers have

20  likewise asked to be informed whether enforcement of the Rule is enjoined. See Stark

21  Decl. ¶ 11; Bonino Decl. ¶ 6, 7.

22   b. <u>The City is Inflicting Harm Through Lax Enforcement of its Rules</u>.

23  The City's continued commitment to the validity of the Card Check Rule is an

24  integral part of the process that is putting Aeroground at a competitive disadvantage. The

---

(…continued)
yet reviewed the case thoroughly. <u>Id.</u> She said that the timing of the decision will depend on factors such as the complexity of the case and the NMB caseload. <u>Id.</u> Moreover, once her decision is made, there are further NMB procedures to be followed before the determination is finalized. <u>Id.</u>

1   City, while ostensibly remaining out of the battle, has allowed enough lapses of

2   enforcement that customers of Aeroground have become apprehensive about dealing with

3   the Company.  While the City ostensibly is limiting the Union to only a few pickets at each

4   location, the City has allowed 50 pickets to mass at one location, thus disrupting the

5   operations of Aeroground customers and causing this customer to express dissatisfaction

6   with Aeroground.  The City claims that this does not constitute lax enforcement because the

7   Airport, knowing that the Union was going to violate its permit, did nothing.  Decl. of Tryg

8   McCoy In Opp. to Mot. for Prelim. Inj., ¶¶ 2-4.  In the same vein, a Union organizer has

9   used her City-issued security badge to gain access to restricted areas of Aeroground's

10  facilities and disrupt operations.  The City has professed to be unable to determine who

11  might be at fault despite positive identification of the individual by numerous employees.

12  Wynhoven Decl., Exh. B at ¶¶ 4, 7-10.  The Union has also unlawfully distributed false and

13  defamatory leaflets in the passenger terminals of Aeroground's customers.  The City has

14  allowed the Union to use an assumed name which makes it much harder for the City or

15  Aeroground to hold the Union legally responsible for its misconduct.[9]

16      While the City glosses over these incidents as "trivial," Aeroground's customers

17  who are subjected to these disruptions on a daily basis do not experience them as such and,

18  in fact, have complained to Aeroground about these disruptions.  Bonino Decl. ¶ 6-8; Stark

19  Decl. ¶ 4-7.  It is reasonable to expect that Aeroground will suffer a competitive

20  disadvantage if customers continue to be subject to such harassment, are unable to rely on

21  the Airport to prevent it, and cannot enjoy the reassurance of knowing that the "Rule"

---

[9]  As we show, infra, picketing or other activity intended to disrupt operations or to interfere with business relationships is unlawful if engaged in by a "labor organization" in support of an organizing drive.  Such activity by the Union under its own name would come within the prohibitions of 8(b)(7) of the NLRA and 8(b)(4) of the NLRA.  The statute arguably does not apply to the "Coalition for Peace and Justice."  Of course, it might be possible to seek redress from the "Coalition for Peace and Justice" if this phantom organization had officers and directors and were made to follow Airport procedures for obtaining a permit, which is not happening.  Thus, the purpose of the assumed name from a phantom organization is to allow prohibited conduct under circumstances that allow an escape from responsibility.  As we have shown, (Wynhoven Decl., Exh. B, ¶¶ 7-9) Aeroground has complained of this practice to the Commission, which professes not to see the point.

1   Aeroground is supposedly "breaking" has been enjoined pending a final decision on its
2   validity.  See Stark Decl. ¶ 11; Bonino Decl. ¶ 9.

       3.    <u>The Alleged Hardship to the City is Illusory</u>.

          a.    <u>The "peace" supposedly provided by the Rule is provided only during the pendency of the organizing drive, when it is required by law in any event.</u>

7   The City implies that the injunction will work a hardship on the City because it will
8   allow picketing that would otherwise be foreclosed.  The City cites the fact that the Rule
9   seeks "forbearance by any Labor Organization from economic action including strikes,
10  picketing, boycotts or other such interference with the business of the [employer]."  Def.
11  Opp., p. 12.  The City truncates its quotation from the Rule so as to omit the language
12  which follows the phrase quoted above, <u>i.e.</u>:  "in relation to an organizing campaign only
13  (not to the terms of a collective bargaining agreement)."  Monrad Decl., Exh. B at ¶ I.1(c).
14  Thus, the only "peace" promised is that there will not be picketing or other activity
15  during an organizing drive.  This is a legal obligation of the Union absent the Card Check
16  Rule.  Specifically, section 8(b)(7) of the National Labor Relations Act forbids picketing
17  "where an object thereof is forcing or requiring an employer to recognize or bargain with a
18  labor organization as the representative of his employees . . . (C) where such picketing has
19  been conducted without a petition under section 9(c) [seeking a representation election]
20  being filed within a reasonable period of time not to exceed thirty days..."  29 U.S.C.
21  § 158(b)(7).  Moreover, any picketing is unlawful if an effect of such picketing is to
22  "induc[e] any individual employed by any person other than the primary employer in the
23  course of his employment to refuse to pick up, deliver or transport any goods, or not to
24  perform any services."  <u>Id</u>.  As to the supposed fact that this Rule "gives" the City the right
25  to be free from sympathy strikes, and the supposed injury from the "loss" of this protection,
26  the NLRA further forbids a labor organization "to engage in or to induce or encourage any
27  individual employed by any person engaged in commerce to engage in, a strike or a refusal
28  in the course of his employment to use, manufacture, process, transport or otherwise handle

1  or work on any goods, articles, materials, or commodities or to perform any services." 29

2  U.S.C. § 158 (b)(4). Thus, the only "peace" actually promised by the Card Check Rule is a

3  union's agreement not to engage in activity that is already prohibited by existing law.

4      Moreover, the City's calculus as to the benefits of the Rule ignores the 100+

5  Aeroground employees who have complained about the Union tactics (Scherer Decl. ¶ 9)

6  and the Hallmark employees who have complained about misrepresentations by supposed

7  union "representatives" and asked Hallmark not to deal with their supposed

8  "representatives."  McGuffin Decl. ¶ 7, 9.

9      b.    <u>Aeroground only asks the Court to require the City to do what it</u>

10     <u>professes to be willing to do voluntarily</u>.

11     The only action presently requested is an injunction with respect to Aeroground.

12 Since the filing of this case, the City has postured itself as more than willing to stay its hand

13 with respect to Aeroground.  Thus, the City would only be asked to do what it professes to

14 be willing to do voluntarily.  There is, thus, no hardship to the City.  The major impact

15 would be that the injury to Aeroground from loss of goodwill and the competitive

16 disadvantage to Aeroground would be weakened, as we have shown, Aeroground would

17 have certainty that the economic devastation the City has threatened would not occur during

18 the pendency of this litigation.

19     III.    <u>CONCLUSION</u>

20     For the reasons set forth above, the preliminary injunction sought should be granted.

21     Dated: June ___, 2001.

22     PILLSBURY WINTHROP LLP
    WILLIAM GAUS
23     NATALIE BECCIA
    URSULA A. WYNHOVEN
24     50 Fremont Street
    Post Office Box 7880
25     San Francisco, CA 94120-7880

26

    By _____
27     William Gaus
    Attorneys for Plaintiff
28     AEROGROUND, INC.